### PEOPLE ex rel. LUDWIG v. LUDWIG & CO.

(Supreme Court, Appellate Division, First Department. June 5, 1908.)

1. CORPORATIONS—RIGHTS OF STOCKHOLDERS—INSPECTION OF BOOKS.

That a stockholder furnished a trade journal copies of moving papers in a proceeding to compel the corporation to allow him to inspect its books, in which papers mismanagement of the corporation was charged, and that he caused copies of the journal which set out such papers to be sent to persons having business relations with the corporation, does not affect his rights as a large stockholder to an inspection to acquire information respecting the management.

2. SAME.

That a stockholder manufactures musical instruments similar to those manufactured by the corporation does not affect his rights as owner of 43 per cent. of the corporation's stock to inspect its books under a claim that the corporation was being mismanaged; he concededly having the right to manufacture such instruments.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, § 674.]

3. SAME.

A bona fide stockholder owning 43 per cent. of a corporation's stock is entitled to inspect its books to acquire information respecting its management, where much of its funds has been expended in erecting a factory on land owned by the president's sister.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, § 674.]

Appeal from Special Term.

Mandamus proceeding by the people of the state of New York, on the relation of John H. Ludwig, against Ludwig & Co. From an order denying his motion for a peremptory writ of mandamus, commanding and requiring the respondent Ludwig & Co., a domestic corporation, to forthwith exhibit to the relator or to his attorney and

accountants "all books of account, records, and papers of said corporation from the commencement of the year 1905 to the time of such exhibition, and to permit them to fully examine the same and to take extracts therefrom," relator appeals. Reversed, and motion granted.

Argued before INGRAHAM, LAUGHLIN, CLARKE, HOUGHTON, and SCOTT, JJ.

Alton B. Parker, for appellant.

Albert Ritchie, for respondent.

LAUGHLIN, J. The relator owns 1,631 shares of the capital stock of the corporation, of the par value of $100 per share, which is more than 43 per cent. of the entire capital stock which has been issued and is outstanding. There is no room for the inference or even suspicion that the relator did not become a stockholder in good faith, for he and one Charles A. Ericsson formed a partnership in the year 1899 to manufacture pianos and to deal in mechanical instruments, and they incorporated the business in the month of April, 1902, at which time the stock was issued to him for his interest in the business transferred to the corporation. When the corporation was formed, the relator became its president and Ericsson its treasurer. In the year 1904 Ericsson failed of re-election. At the annual election of directors in 1906 the relator failed of re-election, and was superseded by Ericsson. During the time the relator was president of the company he was also one of its two general managers. The moving papers show that during the year 1905 the profits of the company amounted to more than $125,000, and that during the year 1906, during which the relator ceased to have a voice in the management of its affairs, the profits amounted to only about $85,000. Owing to this decrease in the profits, the relator demanded a detailed statement of the company's financial affairs, which was refused; but he was thereafter furnished a general statement of its resources and liabilities. In December, 1906, the company employed an architect to prepare plans and specifications for the erection of a six-story and basement piano factory on premises in the borough of Manhattan, New York, which were thereafter and on the 8th day of January, 1907, conveyed by one Weed, the owner thereof, to Albertine E. Ericsson, who is the sister of the president of the defendant. On the 14th day of May, 1907, plans and specifications prepared by the architect and verified in behalf of the owner of the premises by the president of the respondent for the construction of the factory on said premises were filed with, and thereafter and on the 13th day of June, 1907, approved by, the bureau of buildings. The architect estimated that the cost of the factory would be $230,000. On the day the plans for the factory were approved by the bureau of buildings contracts for the construction thereof were made by the president of the company in the name of his sister as her attorney. Funds of the company to the extent of $2,900 were used to pay the architect, and to pay the contractors who proceeded with the work of constructing the factory, the checks being drawn by the company, payable to the order of the president's sister, and indorsed by him as her attorney. The factory

is fully inclosed, and there has been already expended upon it corporate funds to the extent of $118,563.25, or a greater sum, and obligations of the company in the form of notes issued to the contractors are still outstanding and unpaid. The premises upon which the factory has been constructed are estimated by the relator to be worth $60,000, and it appears that the president's sister is not worth to exceed the sum of $6,500. On the 31st day of July, 1907, the relator by letter renewed his demand, and received a reply to the effect that his request had been referred to the treasurer of the company "to send out whatever statement the stockholders should receive in accordance with the corporate management." The relator again requested leave to inspect the corporate books since the time he ceased to be president thereof. This demand was made on the president of the company personally, the relator being accompanied by his attorney, who explained that the relator had reason to believe that the assets of the company were being diverted to purposes other than the manufacture of pianos, and that notes were being given by the company, whereas its obligations had theretofore been paid in cash, and that he doubted the integrity of the management of the company. The president of the company requested time to submit the demand to the attorney for the company. This request was acquiesced in, but no answer was received to the demand within the time agreed upon therefor. On the 7th day of November, 1907, the relator again by a letter demanded that he be permitted to examine the books and papers by his attorney and accountants at such hours as might be reasonable and convenient to the parties. On the 8th day of November, 1907, he received from the company a reply to his letter, denying the necessity for the examination and the sufficiency of the grounds alleged therefor, and questioning his good faith, but offering to furnish any further statement of the affairs of the company "within reason." He again wrote the company on the 11th of the same month, asserting his right to the examination on the ground that he was informed and believed that the funds of the corporation were being applied to other than corporate purposes, and demanded an answer as to whether his request for an examination would be granted. In reply to that letter he received a communication from the company, under date of November 12th, refusing his request. On the 28th day of October, 1907, the architect filed a mechanic's lien against the premises upon which the factory was being constructed, on account of his contract with Ludwig & Co., for $6,453.31, which remains unpaid. These facts are not controverted.

The respondent, however, presented affidavits tending to show that the relator was responsible for his failure of re-election as a director and as treasurer in 1904, and reflecting on the management of the corporation under the relator's administration thereafter, and tending to show that he devoted most of his time "to the piano player business in which he was personally interested"; that the profits of the business from the organization of the corporation in April, 1902, until the 1st of January thereafter, were $84,301.65, for the year 1903, $105,126.42, and for the year 1904, only $50,706.45; and that during the year 1905, when the profits were more than $125,000, the relator took

no interest in the business, but devoted his time to the piano player business; that the decrease in profits in the year 1906 was owing to the advance in price of material and better workmanship and a change in the method of computing profits; that the company has a contract under date of January 8, 1907, with its president's sister, "wherein and whereby she undertakes and agrees to build or cause to be built a factory" and to convey the premises and factory to the respondent at the price of $47,516.25, plus the actual cost of construction, which the respondent agreed to advance from time to time, and that the reason the respondent did not purchase the premises from the former owner was that its president was advised that "real estate can be dealt with with greater facility when standing in the name of an individual than when standing in the name of a corporation, and that the best interests of the corporation would be promoted by taking the property from an individual with the factory already erected thereon than in taking title to the property in its own name and by carrying on the building operations as a corporation"; that the relator did not make a request for "specific information"; that, when the business was transferred to the corporation, there was reserved from the assets of the partnership "patents, tools, fixtures, and such like articles relating to what was known as the piano player business then being conducted by the partnership"; that the relator·had been experimenting with various piano-playing devices, but at that time had not perfected any device; that after the formation of the corporation a contract was made between it and the relator and Ericsson for the manufacture of piano players by the corporation for the copartnership at cost, plus the same rate of profit that the corporation made in its general business, under which the partnership was to have the exclusive right to use the name "Ludwig" in connection with the piano player; that thereafter stock of the corporation was sold to various parties who were not informed of this agreement; that in January, 1904, Ericsson assigned his interest in the piano player business to the relator; that late in the year 1904, while Ericsson was in Europe, the relator procured a modification of the agreement with the corporation, whereby it was continued indefinitely, at the election of ·the relator, beyond the time fixed for its expiration, and permitting the use of one-half of the capital of the corporation in the piano player business; that in January, 1906, the respondent discontinued work on the piano player device, because such device had not been perfected, and the relator had not paid the amount due to the respondent under the contract;. that thereafter the relator formed a corporation under the name "Claviola Company," the name "Claviola" having been applied by him to a sample piano player which he had manufactured, since which time the relator had advertised in musical trade papers and otherwise "in his own name, and in such manner as to lead the public to believe that he was making the Ludwig piano, and has attempted in this wise to divert the trade of the respondent to himself"; that the instruments made by the copartnership and thereafter by the respondent have always been known in the trade as the "Ludwig piano"; that in the month of April, 1907, the relator began an action for the specific performance of the agreement with the respondent for the

manufacture of piano players and to enjoin the respondent from using the name "Ludwig" and "Ludwig & Co." in connection with automatic piano players, and from manufacturing, advertising, or selling automatic piano players, and for damages for breach of the contract, and for profits made by the respondent on piano players; that in his action the relator showed that the respondent was manufacturing and selling automatic players under the name of "Ludwig & Co.," and cuts or illustrations from its catalogue in which were shown "piano players" manufactured and sold by the respondent; that there is a distinction well understood in the trade between the "piano player" and the "player piano"; that the "piano player" is a device to be placed in front of a piano, and, when used by the performer, operates directly on the keyboard and can be removed from one instrument to another, but that the "player piano" contains within the case of the piano "a mechanism which permits the piano being played automatically," and is a part of the particular piano for which it is constructed and "may be played by the performer operating on the keyboard directly, or by the use of the automatic mechanism"; that in the action brought by the relator the respondent has interposed a counterclaim demanding the cancellation of the agreement upon the ground that the same was procured in fraud of the rights of its stockholders, and that it was procured in violation of the relator's trust relation to the corporation; that the president and treasurer of the respondent believe that the relator's application is not made in good faith for the purpose of protecting his interests as a stockholder, but to gain an unfair advantage over it by ascertaining the names of its customers and the price which it pays for material and labor, and the price at which it sells its various instruments, and for the purpose of using the examination on the trial of his action against it. The motion for the writ of mandamus was heard on the 24th day of December, 1907. Thereafter the court granted leave to the respondent to file additional affidavits tending to show that during the argument of the motion a representative of and writer for the "Musical Courier Extra," a trade paper printed and published in the city of New York, sat beside the relator and engaged in conversation with him, and that thereafter, in the issue of said "Musical Courier" published on the 28th day of December, 1907, an article was published concerning this litigation, setting out in full the moving papers, together with the complaint in the action by the relator against the respondent, the substance of the answer therein and a copy of the plaintiff's reply thereto; that a marked copy of said "Musical Courier" was sent to various officers, stockholders, and employés of the respondent and to some of its customers and persons from whom it purchases materials and to its bank, which have given rise to inquiries concerning its financial responsibility.

The relator, in opposition to the motion for leave to file the supplemental affidavits, presented affidavits tending to show that he was not responsible for the presence on the hearing of the motion of the correspondent of the "Musical Courier," but that, on being informed by such correspondent that he intended to publish a full account of the proceedings, the attorney of record of the relator stated that he pre-

ferred that the papers be published, rather than commented upon. It appears that a representative of the "Musical Courier" applied to the respondent for its answering affidavits and its answer in the action, but he was not permitted to see or copy the same. The relator admitted that most of the marked copies of which complaint was made were mailed by his direction, and his explanation of the circumstances under which he caused this to be done tends to show that he was not actuated by bad faith or a desire to injure the respondent, but that the information had been solicited from him in a manner and under circumstances leading him to believe that it was better that his claims be presented in full from the documents, rather than stated by himself or his attorney. Those to whom the papers were forwarded either had business relations with the relator's company or were interested in the affairs of the respondent in common with him, or were personal friends of his, and thus interested in the outcome of the litigation.

The action of the relator and his attorney in furnishing the copies of the papers to the "Musical Courier" and in requesting that copies of the publication be forwarded to some of the parties to whom they were sent was indiscreet and unwarranted, but does not afford him sufficient ground to deprive him of his rights as a very large stockholder in the respondent. His counsel who argued the appeal for the relator expressly disclaimed on the argument of the motion below and on the argument of the appeal any desire to discover the names of the customers of the respondent. The fact that the relator and his company are manufacturing somewhat similar instruments to those manufactured by the respondent is no justification for refusing the inspection. The relator concededly has the right to manufacture and sell the instruments which he and his company are manufacturing and selling, and he and his assigns have the exclusive right to use the name "Ludwig" in connection with the manufacture and sale of piano players, and, if his contention in the action be sustained, the respondent is violating those rights. The relator's contract with respondent for the manufacture of piano players may or may not be enforceable, but, when the corporation acquired the business of the copartnership, the right to manufacture and sell piano players was reserved. It was therefore a right existing in the relator before the respondent was organized. He is in no sense an interloper, but a bona fide stockholder of the respondent, whose interests in the respondent are so vast that he is entitled to accurate information with respect to its management, in view of the manner in which its funds have been expended on property owned by the sister to the president of the company.

It follows that the order should be reversed, with $10 costs and disbursements, and motion granted with $10 costs, the order for the writ and the writ, however, to contain a clause excepting from its operation those parts of the books and records of the corporation showing the names of its customers.

CLARKE, HOUGHTON, and SCOTT, JJ., concur. INGRAHAM, J., concurs in result.